IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| **CHRISTOPHER CAULFIELD,** | * | |
| 508 Pafel Road | | |
| Annapolis, MD 21401 | * | |
| *Plaintiff,* | * | **CIVIL CASE NO.**_____ |
| v. | * | |
| **THE BOARD OF TRUSTEES OF ANNE ARUNDEL COMMUNITY COLLEGE,** | * | |
| 101 College Parkway | * | |
| Arnold, Maryland 21012 | | |
| | * | |
| SERVE: Martin J. Snider, Esquire | | |
| 203 Dreams Landing Way | * | |
| Annapolis, MD 21401-1013 | | |
| | * | |
| *Defendant.* | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

Plaintiff Christopher Caulfield ("Mr. Caulfield") through counsel makes this Complaint against the Board of Trustees of Anne Arundel Community College ("AACC") for violations of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*; Title II of the American with Disabilities Act, 42 U.S.C. § 12132 *et seq.*; and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.*, and seeks declaratory and injunctive relief, compensatory damages, and an award of attorneys' fees and costs.

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. §1331 in that this action asserts violations of rights secured by the laws of the United States.

1

2.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b), as the events giving rise to the claim occurred in the District of Maryland, and there is no other district in which this action may be brought.

**PARTIES**

3.     At all times relevant to this Complaint, Mr. Caulfield was a student enrolled in AACC, and was a resident of Maryland.

4.     AACC is a community college located in Arnold, Anne Arundel County, Maryland. It has a partnership with the University of Maryland Baltimore (UMB) Graduate School for a Collaborative Physician Assistant Program ("Program") in which students complete a Master of Science in Health Science from UMB and a Certificate of PA Studies from AACC.

5.     AACC receives federal assistance in various forms, including financial aid.

**FACTS COMMON TO ALL COUNTS**

6.     Mr. Caulfield is a thirty-two-year-old (32) male, who has a passion for helping others and whose goal is to become a Physician Assistant ("PA"). He was succeeding in the Program and a few months shy of graduating when AACC abruptly dismissed him because it improperly regarded Mr. Caulfield as disabled, due to his prior, fully remediated alcohol dependency, and resented his resisting an invasion of his personal and medical privacy in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Program's accreditation standards. In dealing harshly with Mr. Caulfield, AACC acted out of an ingrained gender bias, wherein female students are invariably dealt with more leniently.

7.     Mr. Caulfield's alcohol dependency began in 2009, while he was attending Towson University. One evening, Mr. Caulfield was assaulted on campus by a group of students

2

and suffered a broken jaw and injuries to his head that required a long period of convalesce. After the assault, Mr. Caulfield spiraled into depression and presented to a psychiatrist, who diagnosed him as clinically depressed and with Post Traumatic Stress Disorder (PTSD).

8. Despite seeking professional help, Mr. Caulfield began to self-medicate by drinking alcohol. He was arrested twice for driving under the influence, and fell into a deeper depression.

9. In 2016, after being arrested for his second DUI, Mr. Caulfield acknowledged his substance abuse issues and began the road to recovery. He started attending Alcoholics Anonymous meetings and submitted to intensive substance abuse counseling. He also took up long-distance running and completed his first marathon within a year.

10. In 2017, after having been sober for more than a year, Mr. Caulfield applied to AACC's Program with the hope of realizing his dream of becoming a PA.

11. In his application, Mr. Caulfield disclosed his substance abuse history, DUI convictions, and efforts to achieve and maintain sobriety.

12. AACC conditionally accepted Mr. Caulfield into the Program provided he maintain his sobriety and recovery and a treating physician declare he was competent to perform the obligations of a PA student.

13. In January 2018, after being notified of his conditional acceptance, Mr. Caulfield was summoned into a meeting with AACC's then- Assistant Dean Dr. Mary Jo Bondy and then- Clinical Coordinator Timothy Parker to discuss the terms of his acceptance: Mr. Caulfield was required to discuss his plan to maintain his sobriety and recovery with his personal physician and disclose this on a "Health Status Update Report" ("HSUR") to be submitted by Mr. Caulfield's

3

physician on May 1, 2018, August 1, 2018, January 1, 2019, May 1, 2019, August 1, 2019, and January 1, 2020.

14. The HSURs called for Mr. Caulfield's physician to release medical information requested by the Program and to evaluate Mr. Caulfield's "health condition/limitation."

15. Dr. Bondy and Mr. Parker assured Mr. Caulfield they wanted him to succeed with the Program and AACC would keep confidential his mental health, substance abuse history, and completed HSURs. They also assured him that no one else in the Program would be made aware of the terms of his acceptance.

16. It was Mr. Caulfield's understanding that Tammie Neall, AACC's Manager of Admissions & Advising School of Health Sciences, would receive the completed HSURs on behalf of AACC, and she would keep the forms confidential, disclosing them only if there was a concern.

17. Mr. Caulfield began the Program with his cohort in May 2018. The Program is twenty-six months long and divided into two parts: didactic followed by clinicals.

18. Mr. Caulfield successfully completed the didactic phase with no issues.

19. Meanwhile, in 2019, the Program underwent a complete change in leadership. Dr. Bondy and Mr. Parker both resigned from their positions and the Program terminated its academic coordinator and several faculty members.

20. The changes to the Program, particularly the loss of Dr. Bondy and Mr. Parker, who had always been supportive of Mr. Caulfield, caused Mr. Caulfield's anxiety and depression to intensify. Rather than turning to alcohol, Mr. Caulfield sought help from his substance abuse counselor and a new psychiatrist.

21. At no time did Mr. Caulfield's treating physician report that Mr. Caulfield was struggling with his sobriety or was not competent to perform his duties as a PA student.

22. Nonetheless, Dr. Cherilyn Hendrix approached Mr. Caulfield in the spring of 2019 to question him about his substance abuse history and sobriety. Dr. Hendrix had assumed the role of Assistant Dean following Dr. Bondy's resignation. Dr. Hendrix informed Mr. Caulfield she was aware of his conditional acceptance and the HSURs. Dr. Hendrix pressed Mr. Caulfield for details about his substance abuse history. When Mr. Caulfield explained he had already made adequate disclosure to Dr. Bondy and Mr. Parker, and, respectfully, did not wish to discuss them further, she became angry.

23. Dr. Hendrix told Mr. Parker, who was still on campus at that point, "If he [referring to Mr. Caulfield] crosses the line, he is out of here."

24. Theresa Neumann, who Dr. Hendrix had hired to be AACC's new Academic Coordinator, then, seemingly at random, questioned Mr. Caulfield about his "sobriety" and pressed him for details about his medications and other highly confidential medical issues

25. In a one-on-one meeting with Ms. Neumann that same spring, Ms. Neumann told Mr. Caulfield he should decrease his medication doses and discontinue taking certain medications. Mr. Caulfield rebuffed Ms. Neumann's opinions, which angered her.

26. The Accreditation Standards for PA Education prohibits principal faculty from participating as health care providers for students, except in emergency situations. (ARC-PA A3.09). Ms. Neumann should not have been counseling Mr. Caulfield about his medication.

27. More significantly, Ms. Neumann should not have known the medication Mr. Caulfield was taking or why he was taking it. The HSURs did not call for Mr. Caulfield's physician to disclose his medication or medication dosages, and given Mr. Caulfield's physician

had reported that he was continuing with his counseling, was doing well with no signs of alcohol abuse, and was competent to pursue the Program, there would have been no reason for AACC or Ms. Neumann in particular to know or discuss Mr. Caulfield's medications.

28. Ms. Neumann also made offhand remarks to Mr. Caulfield like "It looks like you lost weight," "You do not look healthy," "Are you drinking alcohol?" "Have you been partying?"

29. Despite the Program's new leadership, Mr. Caulfield continued to excel; by December 2019, he had successfully completed five of the nine clerkships required for graduation.

30. On January 6, 2020 Mr. Caulfield began his sixth clerkship in Emergency Medicine and was assigned to Franklin Square Hospital (FSH) with Jessica Kearney as his preceptor. Ms. Kearney was employed by the hospital as a PA and was charged with overseeing Mr. Caulfield's Emergency Medicine clerkship.

31. Shortly into his Emergency Medicine rotation, Mr. Caulfield was scheduled to have a site visit by a faculty member. The Program required two site visits. Mr. Caulfield had a successful site visit in one of his prior rotations. This was to be his second and final site visit.

32. On January 29, 2020, Ms. Neumann conducted Mr. Caulfield's second site visit. Ms. Neumann questioned a number of the providers with whom Mr. Caulfield had worked at FSH and each responded positively.

33. Following the site visit, Ms. Neumann informed Mr. Caulfield he had performed well and asked if he had any issues with the rotation. Mr. Caulfield expressed his concern about a communication breakdown between himself and Ms. Kearney in that Ms. Kearney had failed to respond to two of his emails about his hours needed to complete the rotation. Ms. Neumann stressed to Mr. Caulfield that it was his duty to make sure he got the necessary hours.

34. Immediately after meeting with Ms. Neumann, Mr. Caulfield called Ms. Kearney to discuss his rotation hours. During the call, Mr. Caulfield mentioned he had just spoken to Ms. Neumann, who had been at FSH for his site visit. Ms. Kearney immediately became angry she had not been notified of the visit in advance and blamed Mr. Caulfield for a "lack of communication." Ms. Kearney told Mr. Caulfield she would be calling AACC to complain about him.

35. Ms. Kearney did in fact complain to Dr. Hendrix, which gave Dr. Hendrix the excuse she needed to set in motion Mr. Caulfield's dismissal from the Program. Dr. Hendrix did not defend Mr. Caulfield by telling Ms. Kearney the site visit is to be facilitated by AACC's faculty and not by the student, per the Program manual.

36. Following her discussion with Mr. Caulfield, Ms. Kearney offered Mr. Caulfield "make up" twelve-hour shifts on January 31 and February 6 via email dated January 29. In her email, Ms. Kearney wrote they could discuss everything when they worked together on February 2.

37. Mr. Caulfield was only short twelve hours so he did not have to work both shifts. Mr. Caulfield planned to work the February 6 shift, which gave him the opportunity to first work with Ms. Kearney on February 2.

38. On January 31, at approximately 1:00 p.m., Mr. Caulfield received a telephone call from Dr. Hendrix. According to Dr. Hendrix, Ms. Kearney had reported him as a "no call-no show" that day. Apparently, Ms. Kearney mistakenly believed Mr. Caulfield needed an additional twenty-four (and not twelve) hours to complete the clerkship and had expected Mr. Caulfield to work both make up shifts.

39. Mr. Caulfield tried to explain to Dr. Hendrix the January 31 shift was not a scheduled shift, but had been offered by Ms. Kearney as a makeup shift along with February 6, which he had planned to work to get his required hours. (He pointed out the January 31 shift had not been approved by the Program, which created liability issues Mr. Caulfield and the other students had been cautioned to avoid).

40. Dr. Hendrix became angry and ordered Mr. Caulfield to meet with her on February 7 after his end of rotation exam. In the meantime, Dr. Hendrix instructed Mr. Caulfield to apologize to Ms. Kearney by email and copy her. Mr. Caulfield immediately complied with Dr. Hendrix's order.

41. Ms. Kearney did not respond to Mr. Caulfield's apology. His next communication with Ms. Kearney was on February 2 when he worked a twelve-hour shift with her with no breaks or lunch. Throughout the shift, Ms. Kearney belittled Mr. Caulfield before his peers and patients causing one of the nurses to express concern for Mr. Caulfield.

42. On February 7, Mr. Caulfield attended class to take his end of rotation exam. He scored an 84%.

43. Immediately following class, Mr. Caulfield met with Dr. Hendrix, who handed him a letter dated February 7 stating he was on "probation" because he had failed to notify Ms. Kearney of Ms. Neumann's site visit on January 29 and had failed to appear for the January 31 make up shift. Dr. Hendrix claimed in her letter that she had advised Mr. Caulfield during their telephone call on January 31 he had been placed on probation, which Mr. Caufield did not recall occurring. Even if Dr. Hendrix had in fact placed Mr. Caulfield on probation as of January 31, her doing so verbally violated the Program's policies and procedures.

44. On February 10, Mr. Caufield began his Cardiology rotation at another clinic.

45. On February 13, AACC posted Mr. Caulfield's final evaluation grade for Emergency Medicine. For the first time, a new component called "professionalism" had been added. Mr. Caulfield receive a zero out of ten in that component causing him to fail.

46. Mr. Caulfield does not know whether the other students in the Program were graded on professionalism.

47. Mr. Caulfield immediately questioned Dr. Hendrix about his grade and the new component. Dr. Hendrix informed Mr. Caulfield that Kerry Birney, who Dr. Hendrix had hired to replace Mr. Parker as Clinical Coordinator, was doing the grading and had Ms. Kearney's evaluation of him in her possession. Dr. Hendrix told Mr. Caulfield she would look into the matter and follow up with him.

48. On February 19, while in his Cardiology rotation, Mr. Caulfield received a call from Dr. Hendrix ordering him to come to campus immediately. Mr. Caulfield complied and was summoned into a meeting with Dr. Hendrix and Ms. Birney and told he had been dismissed from the Program because he had failed the Emergency Medicine clerkship.

49. Mr. Caulfield requested to see a copy of Ms. Kearney's evaluation, and saw Ms. Kearney had repeatedly penalized him for failing to notify her of Ms. Neumann's site visit, failing to appear for the January 31 shift, and other trivial matters, which he could easily rebut. Noticing Ms. Birney had given him a 74.5% based upon Ms. Kearney's comments, he requested the opportunity to provide a rebuttal. Mr. Caulfield needed just a 75% to pass the clerkship and, until that point, had maintained a cumulative 3.2 GPA in the Program.

50. In response to his request, Ms. Birney rolled her eyes and Dr. Hendrix told him the decision was final, but he could appeal his dismissal to the Committee on Progression.

51. The Committee was comprised, in part, of Dr. Hendrix, Ms. Birney, and Ms. Neumann, each of whom knew about Mr. Caulfield's mental health and substance abuse issues and had shown hostility toward him, particularly after he resisted their invasion of his personal and medical privacy.

52. Fearing he would not receive a fair and impartial decision from the Committee, Mr. Caulfield reached out to the UMB Ombudsman, who said Mr. Caulfield's case was "highly unusual" because he was so close to graduating and had been successful in his previous five clerkships and didactic year.

53. On February 28, Mr. Caulfield met the president of his cohort and two of his classmates to discuss his appeal. Mr. Caulfield had confided in them that he had been dismissed from the Program and had asked for their help with his appeal. Mr. Caulfield presented them with a draft of his written appeal defending himself. To his surprise, the cohort president told Mr. Caulfield that Dr. Hendrix had pulled him into a meeting after class and told him that, if Mr. Caulfield wrote the "right" letter, he would have a good chance of remediation.

54. Remediation would allow Mr. Caulfield to stay in the Program and is often granted students who fail a clerkship.

55. Dr. Hendrix had intimated to the class president that the "right" letter meant Mr. Caulfield needed to admit responsibility for his actions.

56. It was a violation of A3.20 of the Accreditation Standards for Dr. Hendrix to discuss with Mr. Caulfield's classmate his confidential academic record.

57. Mr. Caulfield rewrote his appeal based upon Dr. Hendrix's conversation with the cohort president and submitted it to the Committee on March 2.

58. By letter dated April 1, Dr. Hendrix informed Mr. Caulfield the Committee had recommended to uphold his dismissal and not allow for readmission to the Program. According to Dr. Hendrix, she and the Dean of the School of Health Science "accepted and adopted" that recommendation.

59. True to her word, Dr. Hendrix used Mr. Caulfield's perceived "crossing the line" to abruptly dismiss Mr. Caulfield from the Program. Dr. Hendrix put Mr. Caulfield on probation and dismissed him from the Program for the same incidents, effectively prosecuting him twice for the same offenses without a fair and impartial opportunity to address any of the alleged "professionalism" issues claimed by Ms. Kearney.

60. Mr. Caulfield has spent $115,000 pursuing his education at AACC and is emotionally crushed that he was three clerkships away from realizing his dreams of becoming a PA when he was illegally dismissed from the Program. Assuming Mr. Caulfield is able to gain admission to another PA Program, he will incur another $175,000 in tuition and fees and be delayed at least three years resulting in lost earnings exceeding $300,000.

**CAUSES OF ACTION**

**COUNT I
DISABILITY DISCRIMINATION - DIFFERENT TREATMENT
PURSUANT TO SECTION 504 OF THE REHABILITATION ACT
AND TITLE II OF THE ADA**

61. The facts alleged above are incorporated by reference.

62. AACC, acting through its new Program leadership, falsely perceived Mr. Caulfield to be "disabled" after learning he was a fully rehabilitated alcoholic and took materially adverse action against him because they perceived his alleged "crossing of the line" to be because of his substance abuse history or a perceived relapse.

63. AACC treated students who were not perceived to have a disability associated with alcohol dependency better than Mr. Caulfield.  For example, while Mr. Caufield's appeal was pending, he received frantic texts and a phone call from Andrea Muniak, one of his female classmates, who was completing her Emergency Medicine rotation at FSH.  Ms. Muniak was upset and concerned because Mr. Kearney had not been notified in advance about her site visit.  Ms. Kearney contacted Dr. Hendrix and complained about Ms. Muniak. Dr. Hendrix took up for Ms. Muniak telling her she would "handle" Ms. Kearney and conduct the site visit herself.  Ms. Muniak's grade was not affected.

**WHEREUPON**, Mr. Caulfield respectfully requests this Honorable Court grant the following relief:

A. Enter a judgment in favor of Mr. Caulfield and against AACC for compensatory damages;

B. Enter a declaratory judgment that AACC violated Mr. Caulfield's rights under the laws of the United States;

C. Enter an injunction compelling AACC to reinstate Mr. Caulfield to the Program and refrain from further discriminatory and retaliatory actions;

D. Assess reasonable attorneys' fees and costs of suit in favor of Mr. Caulfield and against AACC; and

E. Grant Mr. Caulfield such other and further relief as the nature of his cause may warrant.

## COUNT II
## DISABILITY DISCRIMINATION - HOSTILE ENVIRONMENT
## PURSUANT TO SECTION 504 OF THE REHABILITATION ACT
## AND TITLE II OF THE ADA

64. The facts alleged in Paragraphs 1 and 60 above are incorporated by reference.

65. AACC, through its new leadership, created a hostile learning environment for Mr. Caulfield after learning of his substance abuse history and mental health impairments. AACC's harassment of Mr. Caulfield was so severe or pervasive that it interfered with his schooling, invaded his personal and medical privacy in violation of HIPAA and ARC-PA standards A3.20, A3.21 and A3.09, and culminated in his dismissal.

**WHEREUPON**, Mr. Caulfield respectfully requests this Honorable Court grant the following relief:

A. Enter a judgment in favor of Mr. Caulfield and against AACC for compensatory damages;

B. Enter a declaratory judgment that AACC violated Mr. Caulfield's rights under the laws of the United States;

C. Enter an injunction compelling AACC to reinstate Mr. Caulfield to the PA Program and refrain from further discriminatory and retaliatory actions;

D. Assess reasonable attorneys' fees and costs of suit in favor of Mr. Caulfield and against AACC; and

E. Grant Mr. Caulfield such other and further relief as the nature of his cause may warrant.

## COUNT III
## GENDER DISCRIMINATION PURSUANT TO TITLE VI

66. The facts alleged in Paragraphs 1 and 60 above are incorporated by reference.

67. AACC, through its new leadership, took adverse action against Mr. Caulfield because he is male.

68. Ms. Kearney is known to exhibit a pronounced gender bias, consistently treating males worse than females and unfairly evaluating male students. Tommy Phelan, a member of the 2019 cohort, underwent a strikingly similar experience with Ms. Kearney. Mr. Kearney tried to fail Mr. Phelan for "unprofessionalism," but Mr. Parker, who was Clinical Coordinator at the time, intervened so that Mr. Phelan passed.

69. Dr. Hendrix exploited Ms. Kearney's gender bias to trump up a basis for dismissing Mr. Caulfield from the Program, when he otherwise had good grades and positive reviews, because Dr. Hendrix improperly regarded him as disabled.

70. Similarly, Dr. Hendrix mistreated many of the male faculty members fostering a hostile work environment to the point at least one prominent male professor was driven to resign. In fact, since Dr. Hendrix has been Program Director, all the male faculty members in the Program have either quit or been fired.

**WHEREUPON**, Mr. Caulfield respectfully requests this Honorable Court grant the following relief:

A. Enter a judgment in favor of Mr. Caulfield and against AACC for compensatory damages;

B. Enter a declaratory judgment that AACC violated Mr. Caulfield's rights under the laws of the United States;

C. Enter an injunction compelling AACC to reinstate Mr. Caulfield to the PA Program and refrain from further discriminatory and retaliatory actions;

D. Assess reasonable attorneys' fees and costs of suit in favor of Mr. Caulfield and against AACC; and

E.	Grant Mr. Caulfield such other and further relief as the nature of his cause may warrant.

/s/
ROBIN R. COCKEY, Federal Bar No.02657
ASHLEY A. BOSCHÉ, Federal Bar No. 28800
Cockey, Brennan & Maloney, PC
313 Lemmon Hill Lane
Salisbury, MD 21801
410-546-1750
Fax:  410-546-1811
rrdesq@cbmlawfirm.com
bosche@cbmlawfirm.com
*Attorneys for Plaintiff*