IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHRISTOPHER CAULFIELD<br>*Plaintiff*,<br><br>v.<br><br>BOARD OF TRUSTEES OF ANNE<br>ARUNDEL COMMUNITY COLLEGE,<br>*Defendant*. | Civil Action No. ELH-20-1981 |

**MEMORANDUM**

In this discrimination action, plaintiff Christopher Caulfield, a former student in the Physician Assistant Program (the "Program") at Anne Arundel Community College, filed suit against the Board of Trustees of Anne Arundel Community College (the "College" or "AACC"). ECF 1 (the "Complaint"). Caulfield alleges that he was wrongfully dismissed from the Program shortly before graduation based on "an ingrained gender bias" against men, and because AACC "improperly regarded" him as disabled due to "his prior, fully remediated alcohol dependency." *Id.* ¶ 6.

The Complaint contains three counts. In Count I, plaintiff asserts disability discrimination, in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* Count II alleges a violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12132 *et seq.* In Count III, plaintiff alleges intentional discrimination on the basis of sex, in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), as amended, 42 U.S.C. § 2000d *et seq.* Caulfield seeks declaratory and injunctive relief, compensatory damages, attorneys' fees, and costs.

Defendant has moved to dismiss Count III, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 7. The motion is supported by a memorandum of law. ECF 7-1 (collectively the "Motion"). Plaintiff

opposes the Motion (ECF 12), supported by a memorandum of law. ECF 12-1 (the "Opposition"). Defendant has replied. ECF 16.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion.

## I. Background[1]

Caulfield is a thirty-two year old male "whose goal is to become a Physician Assistant" ("PA"). ECF 1, ¶ 6. He participated in the Program from May 2018 until he was "abruptly dismissed" in April 2020, even though he was "succeeding in the Program and a few months shy of graduating." *Id.*; *see id.* ¶ 58.

In 2009, while plaintiff was a student at Towson University, he developed an alcohol dependency. *Id.* ¶ 7. According to plaintiff, his alcohol use began after he was assaulted on campus by a group of students and suffered a broken jaw and head injuries. *Id.* He was subsequently diagnosed with clinical depression and post-traumatic stress disorder, and began to "self-medicate by drinking alcohol." *Id.* ¶¶ 7, 8. In 2016, after Caulfield was arrested for driving under the influence ("DUI") for a second time, he "acknowledged his substance abuse issues and began the road to recovery." *Id.* ¶ 9. As part of his recovery, plaintiff began to attend Alcoholics Anonymous and participated in intensive substance abuse counseling. *Id.*

In 2017, after plaintiff had been sober for over a year, he applied to the Program "with the hope of realizing his dream of becoming a PA." *Id.* ¶ 10. In his application to the Program, plaintiff disclosed his substance abuse history, DUI convictions, and efforts to maintain sobriety. *Id.* ¶ 11.

---

[1] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

In January 2018, AACC accepted Caulfield into the Program on the condition that he maintain his sobriety and that a "treating physician declare he was competent to perform the obligations of a PA student." *Id.* ¶ 12. After receiving notification of his conditional acceptance, Caulfield met with AACC's Assistant Dean at the time, Dr. Mary Jo Bondy, and the Clinical Coordinator at the time, Timothy Parker, to discuss the terms of his acceptance. *Id.* ¶ 13. During the meeting, Caulfield was asked to "discuss his plan to maintain his sobriety and recovery with his personal physician and disclose this on a 'Health Status Update Report' ('HSUR') to be submitted by Mr. Caulfield's physician" on specific dates throughout his time in the Program. *Id.*

Caulfield commenced the Program in May 2018. *Id.* ¶ 17. It is 26 months long and is divided into two parts: didactic and clinicals. *Id.* Plaintiff completed the didactic phase of the Program "with no issues." *Id.* ¶ 18. And, by December 2019, he had completed five out of the nine "clerkships" required for graduation. *Id.* ¶ 29.

In 2019, the Program underwent a "complete change in leadership." *Id.* ¶ 19. Bondy and Parker both resigned from their positions and multiple faculty members were terminated, including the academic coordinator. *Id.* According to plaintiff, the changes to the Program, especially the departure of Bondy and Parker, caused his "anxiety and depression to intensify" so he "sought help from his substance abuse counselor and a new psychiatrist." *Id.* ¶ 20. Notably, plaintiff's physician never reported any sobriety issues. *Id.* ¶ 21.

Dr. Cherilyn Hendrix, the new Assistant Dean, "approached" Caulfield in the spring of 2019 "to question him about his substance abuse history and sobriety." *Id.* ¶ 22. Dr. Hendrix told plaintiff that she "was aware of his conditional acceptance" into the Program and "pressed" him "for details about his substance abuse history." *Id.* Plaintiff claims that when he explained that he had already "made adequate disclosure to Dr. Bondy and Mr. Parker, and, respectfully, did not

wish to discuss them further," Dr. Hendrix "became angry." *Id.* Thereafter, Dr. Hendrix allegedly told Parker: "'If he [referring to Mr. Caulfield] crosses the line, he is out of here.'" *Id.* ¶ 23 (alterations in Complaint).

In addition, Theresa Neumann, AACC's new academic coordinator, "seemingly at random, questioned Mr. Caulfield about his 'sobriety' and pressed him for details about his medications and other highly confidential medical issues." *Id.* ¶ 24. During a meeting in the spring of 2019, Neumann allegedly told Caulfield that "he should decrease his medication doses and discontinue taking certain medications." *Id.* ¶ 25. Plaintiff alleges that he "rebuffed Ms. Neumann's opinions, which angered her." *Id.* Neumann also allegedly made other "offhand remarks" to plaintiff, such as: "'You do not look healthy'" and "'Are you drinking alcohol?'" *Id.* ¶ 28.

On January 6, 2020, Caulfield began his sixth "clerkship," which was in Emergency Medicine at Franklin Square Hospital ("FSH"). *Id.* ¶ 30. Jessica Kearney, a PA and employee of FSH, was responsible for oversight of Caulfield. *Id.*

The Program required two site visits by faculty members during students' clinical rotations. *Id.* ¶ 31. Neumann conducted a site visit to Caulfield's clerkship at FSH on January 29, 2020. *Id.* ¶ 32. Plaintiff "had a successful site visit in one of his prior rotations," so this was intended to be his "second and final site visit." *Id.* ¶ 31. According to plaintiff, the site visits are supposed to be "facilitated by AACC's faculty and not by the student, per the Program manual." *Id.* ¶ 35. The providers at FSH who had worked with Caulfield "responded positively" to Neumann's questions about him. *Id.* ¶ 32.

After the site visit, Neumann informed plaintiff that he "had performed well" and asked if plaintiff "had any issues with the rotation." *Id.* ¶ 33. In response, plaintiff "expressed concern about a communication breakdown between himself and Ms. Kearney in that Ms. Kearney had failed to

respond to two of his emails" regarding the hours he needed "to complete the rotation." *Id.* In response, Neumann "stressed" to plaintiff that it was plaintiff's "duty to make sure he got the necessary hours." *Id.*

After plaintiff's meeting with Neumann, plaintiff called Kearney "to discuss his rotation hours." *Id.* ¶ 34. During the call, Caulfield mentioned to Kearney that he had just spoken with Neumann, who had been at FSH for plaintiff's site visit. *Id.* Plaintiff alleges that Kearney "immediately became angry she had not been notified of the site visit in advance and blamed" plaintiff for a lack of communication. *Id.* Kearney also told plaintiff that "she would be calling AACC to complain about him." *Id.*

Thereafter, Kearney complained to Dr. Hendrix. *Id.* ¶ 35. According to plaintiff, Kearney's complaint "gave Dr. Hendrix the excuse she needed to set in motion Mr. Caulfield's dismissal from the Program." *Id.*

Also on January 29, 2020, Kearney emailed plaintiff and "offered" Caulfield "'make-up' twelve-hour shifts on January 31 and February 6." *Id.* ¶ 36. Caulfield posits that he only needed one additional twelve hour shift to fulfill his requirements, and he planned to work the shift on February 6, not January 31. *Id.* ¶ 37.

At 1:00 p.m. on January 31, 2020, Dr. Hendrix called Caulfield, advising that Kearney had reported him as a "'no call-no show' that day." *Id.* ¶ 38. Plaintiff claims that Kearney "mistakenly believed Mr. Caulfield needed an additional twenty-four (and not twelve) hours to complete the clerkship and had expected Mr. Caulfield to work both make up shifts" on January 31 and February 6. *Id.* Plaintiff "tried to explain to Dr. Hendrix the January 31 shift was not a scheduled shift, but had been offered by Ms. Kearney as a makeup shift along with February 6…." *Id.* ¶ 39. But, "Dr. Hendrix became angry and ordered" Caulfield to "meet with her on February

5

7" after his end of rotation exam. *Id.* ¶ 40. Following plaintiff's phone call with Dr. Hendrix, and at her instruction, Caulfield emailed Kearney to apologize and copied Dr. Hendrix on the email. *Id.* Kearney did not respond. *Id.* ¶ 41.

Plaintiff's next communication with Kearney occurred on February 2, 2020, during a twelve hour shift "with no breaks or lunch." *Id.* According to plaintiff, throughout the shift, Kearney "belittled" Caulfield "before his peers and patients causing one of the nurses to express concern for Mr. Caulfield." *Id.*

On February 7, 2020, Caulfield "attended class to take his end of rotation exam." *Id.* ¶ 42. He scored an 84%. *Id.* After the exam, Caulfield met with Dr. Hendrix, who gave Caulfield a letter stating that he was on probation because he had not notified Kearney of Neumann's site visit on January 29 and had failed to appear for the makeup shift on January 31. *Id.* ¶ 43. The letter also stated that Dr. Hendrix had told Caulfield during their phone call on January 31 that he had been placed on probation 31. *Id.* Plaintiff does not recall hearing anything about probation during that call. *Id.* In any event, he asserts that a verbal communication to that effect is contrary to the Program's policies. *Id.*

Caulfield's "final evaluation grade" for his Emergency Medicine rotation was posted on February 13, 2020. *Id.* ¶ 45. The evaluation included a new component called "professionalism"; plaintiff received a zero out of ten on that component, which caused him to get a failing grade of 74.5%. *Id.* ¶¶ 45, 49. According to plaintiff, he only needed 75% to pass the clerkship and he had maintained a cumulative grade point average of 3.2 until that point. *Id.* ¶ 49. Plaintiff is not aware of whether the other students in the Program were graded on professionalism. *Id.* ¶ 46.

Caulfield "immediately questioned Dr. Hendrix about his grade and the new component" in the evaluation. *Id.* ¶ 47. Dr. Hendrix told Caulfield that Kerry Birney, the new clinical

6

coordinator for the Program, was in charge of grades. *Id.* Dr. Hendrix told plaintiff that she "would look into the matter and follow up with him." *Id.*

On February 19, 2020, while working at his Cardiology rotation, Dr. Hendrix called Caulfield and instructed him "to come to campus immediately." *Id.* ¶ 48. When Caulfield arrived on campus, he "was summoned into a meeting with Dr. Hendrix and Ms. Birney," who told plaintiff that "he had been dismissed from the Program because he had failed the Emergency Medicine clerkship." *Id.*

At that time, plaintiff also reviewed Kearney's evaluation of him. *Id.* ¶ 49. In the evaluation, Kearney "repeatedly penalized [plaintiff] for failing to notify her of Ms. Neumann's site visit, failing to appear for the January 31 shift, and other trivial matters, which he could easily rebut." *Id.* ¶ 49. Plaintiff "requested the opportunity to provide rebuttal." *Id.* In response, Birney allegedly "rolled her eyes" and Dr. Hendrix told plaintiff that the decision was final, but he could appeal his dismissal to the "Committee on Progression" (the "Committee"). *Id.* ¶ 50.

Hendrix, Birney, and Neumann were all members of the Committee. *Id.* ¶ 51. Because they knew about Caulfield's mental health and substance abuse issues, and "had shown hostility toward him," plaintiff feared that he would not receive a fair and impartial decision. *Id.* Thus, Caulfield reached out to the "UMB Ombudsman," who allegedly said plaintiff's case "was 'highly unusual' because he was so close to graduating and had been successful in his previous five clerkships and didactic year." *Id.* ¶ 52.

On February 28, 2020, Caulfield met with the president of his cohort and two other classmates to discuss his appeal. *Id.* ¶ 53. The cohort president allegedly said that Dr. Hendrix "had pulled him into a meeting after class and told him that, if Mr. Caulfield wrote the 'right' letter, [plaintiff] would have a good chance of remediation." *Id.* Further, Dr. Hendrix

7

"intimated…that the 'right' letter meant Mr. Caulfield needed to admit responsibility for his actions." *Id.* ¶ 55. Plaintiff asserts that Dr. Hendrix violated A3.20 of the Accreditation Standards by discussing his confidential academic record with another student. *Id.* ¶ 56.

According to plaintiff, remediation is "often granted [to] students who fail a clerkship." *Id.* ¶ 54. Caulfield submitted his appeal to the Committee on March 2, 2020. *Id.* ¶ 57. By letter of April 1, Dr. Hendrix informed Caulfield that "the Committee had recommended to uphold his dismissal" from the Program. *Id.* ¶ 58. And, Dr. Hendrix and the Dean of the School of Health Science "accepted and adopted" the Committee's recommendation. *Id.*

According to plaintiff, he has spent $115,000 to pursue his education at AACC and is "emotionally crushed" by his illegal dismissal from the Program. *Id.* ¶ 60. In addition to the costs of participating in another program, he estimates lost income of $300,000. *Id.*

## II. Standards of Review

### 1. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and

plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of

action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (citation omitted); *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016); *Edwards*, 178 F.3d at 243. However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir.

10

1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

### III.   Discussion

The Motion is directed only to Count III, which alleges that plaintiff was subjected to intentional discrimination based on gender, in violation of Title VI. ECF 1, ¶¶ 66-70. Caulfield asserts, *inter alia*, that Kearney "is known to exhibit a pronounced gender bias, consistently treating males worse than females and unfairly evaluating male students." *Id.* ¶ 68. Further, he claims that Tommy Phelan, a member of the 2019 cohort, had "a strikingly similar experience with Ms. Kearney," who tried to fail Phelan for "'unprofessionalism.'" *Id.* And, he identifies a female student as a comparator, claiming that she was not subjected to the same punishment, despite similar conduct. *Id.* ¶ 63.

Defendant contends that plaintiff has not adequately alleged discrimination on the basis of gender. ECF 7-1 at 4-6. In particular, AACC maintains that plaintiff failed to allege disparate treatment with respect to similarly situated comparators. *Id.* at 5. Defendant also argues that, to the extent that plaintiff purports to assert a "hostile work environment claim," he fails to meet the pleading requirements. *Id.* at 7.

It is curious that plaintiff lodged a gender discrimination claim under Title VI. It is equally curious that defendant failed to address the fundamental flaw with such a claim.

Title VI provides that no person shall, "on the *ground of race, color, or national origin*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 42 U.S.C. § 2000d (emphasis

added). In other words, the plain text of Title VI is limited to discrimination based on race, color, or national origin; it does not prohibit discrimination based on sex or gender.

The Supreme Court has described Title VI in comparison to another civil rights statute as follows: "Title VI of the Civil Rights Act of 1964 ... is parallel to Title IX [of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*] except that it prohibits race discrimination, *not sex discrimination* ...." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (emphasis added); *see also Regents of Univ. Of Cal. v. Bakke*, 428 U.S. 265, 287 (1978) ("Title VI must be held to proscribe only those *racial classifications* that would violate the Equal Protection Clause or the Fifth Amendment") (emphasis added). And, courts have explicitly held that a plaintiff cannot bring a sex discrimination claim under Title VI. *See, e.g., O'Neal v. Oregon Dep't of Justice*, 3:15-cv-00773-SI, 2015 WL 7722413, at *2 (D. Or. Nov. 30, 2015) (holding plaintiff fails to state a claim under Title VI because he only alleges sex or gender discrimination); *Davis v. City of Vicksburg, Miss.*, 3:13-CV-00886-DCB-MTP, 2015 WL 4251034, at *2 (S.D. Miss. Apr. 27, 2015) ("Plaintiff's claims of discrimination on the basis of sex may not be brought under Title VI.*"); Loch v. Bd. of Educ. of Edwardsville Cmty. Sch. Dist. No. 7*, No. 3:06cv-17-MJR, 2007 WL 1468675, at *4 (S.D. Ill. May 18, 2007) ("[The plaintiff's] claim of discrimination on the basis of sex or disability may not be brought under Title VI. The Court will dismiss that portion of [the plaintiff's complaint] that makes a claim under Title VI."); *Cobb v. United States Merchant Marine Academy*, 592 F. Supp. 640, 642 (E.D.N.Y. 1984) (finding plaintiff cannot have relief under 42 U.S.C. § 2000d because "the provision does not deal with gender-based discrimination").

Plaintiff does not allege that defendant discriminated against him on the basis of race, color, or national origin. He alleges only gender discrimination. Thus, because Title VI does not prohibit gender discrimination, Caulfield fails to state a claim in Count III, based on Title VI.

### IV. Conclusion

Accordingly, I shall grant the Motion (ECF 7), without prejudice.

An Order follows, consistent with this Memorandum.

Date:  April 2, 2021                                        /s/
                                                    Ellen Lipton Hollander
                                                    United States District Judge